UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENNIS M. SAAL, JR.,                    )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                )        Case No. 4:12-CV-359 (CEJ)
                                        )
MICHAEL J. ASTRUE, Commissioner         )
of Social Security,                     )
                                        )
          Defendant.                    )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On October 25, 2007, plaintiff Dennis M. Saal, Jr. filed applications for a period of disability and disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.*, (Tr. 189-192), and for supplemental security income (SSI), Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of July 1, 2007. (Tr. 186-188). After plaintiff's application was denied on initial consideration (Tr. 96-100), he requested a hearing from an Administrative Law Judge (ALJ). See Tr. 106-112 (acknowledging request for hearing).

On August 26, 2009, following a hearing, the ALJ found that plaintiff was not under a disability. (Tr. 87-95). On September 4, 2010, the Appeals Counsel remanded the case back to the ALJ for a new hearing and decision, directing the ALJ to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the plaintiff's occupational base. (Tr. 23-26).

Plaintiff and counsel appeared for a second hearing on November 30, 2010. (Tr. 27-51). The ALJ issued a decision on February 24, 2011 denying plaintiff's application

(Tr. 10-22), and the Appeals Council denied plaintiff's request for review on January 5, 2012. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report[1] (Tr. 231-238), plaintiff listed his disabling conditions as "problems with hands, arms, neck, and back; learning disability; impulsive control problem; rothotis [sic] in feet, legs, and hip; trouble standing; [and] depression." He stated that he is unable to stand on his feet, has trouble walking and keeping balance, cannot lift or grip items because of a lack of strength in his right arm and hand, trouble comprehending and completing simple tasks, trouble remembering simple instructions, and problems with anxiety and depression.

In his Supplemental Questionnaire (Tr. 239-426), plaintiff stated that he suffers from sharp shooting pains in his legs and hands, which escalate with walking or standing, but that he does not require a cane, wheelchair, or walker in order to ambulate. Plaintiff stated that his medication side effects include irritable bowel syndrome, anxiety, and tiredness. Plaintiff affirmed that he is able to pay bills, use a checkbook, complete a money order, do laundry, clean dishes, make a bed, change sheets, vacuum, sweep, take out trash, go to the post office, and prepare meals such as soups, sandwiches, and microwavable items. Plaintiff maintained that he is unable to count change, iron, perform home repairs, mow the lawn, rake leaves, and garden. He stated that he does not go shopping and does not drive because he does not have a car, but does visit friends twice a week. Plaintiff claimed that he has difficulties with

---

[1] The record does not contain a Function Report.

sleeping due to his anxiety and pain in his neck and legs. In an average day he "stay(s) at home a lot," watches television, and showers, but cannot watch a one-hour show or a two-hour movie because of his short attention span. He also stated that he has trouble getting along with others because he "does not like to listen or take advice, [is] frustrated a lot and can't say what he wants to."

In his Appeals Disability Report (Tr. 306-311), plaintiff stated that his depression had worsened since completing his initial application. Plaintiff claimed that he has a hard time dealing with people, that he cries himself to sleep, has difficulty sleeping, has severe anxiety, and "gets upset to the point [he will] go off." Plaintiff blamed his severe depression on his new medication.

## B.  Hearing on November 30, 2010

At the time of the hearing, plaintiff was 37 years old, 5'5" tall and weighed 240 pounds. (Tr. 29, 35). Plaintiff testified to completing high school and receiving some computer technician training. (Tr. 29-30). Plaintiff listed his prior employment as computer repair, diagnostics, and assembly; warehouse management; grocery cart assembly; grill cook and food preparation; oil changer; and maintenance. (Tr. 30-33, 43-45). He stated that he quit his last job in 2007 because he could not keep up with the work and felt that he was going to be fired after his hours were reduced. (Tr. 32).

Plaintiff stated that he has problems with his right elbow, does not have the strength to lift certain items, and that the elbow surgery performed in 2005 provided no relief. He testified to having irritable bowel syndrome and a need to "crack [his neck] to release the tension." (Tr. 34, 41). He stated that because he does not have arches in his feet he has to wear special shoes and orthotics, and that the bones in his knees rub together.  He denied having any x-rays. (Tr. 35). He also testified to having

-3-

separation of discs and arthritis in his hips. (Tr. 35-36). Additionally, plaintiff testified that he suffers from mental issues, which include depression, anxiety, and a learning disability. He struggles with understanding instructions and has "bad hand-eye coordination" which makes him frustrated when trying to do simple jobs. (Tr. 36-37). When asked by the ALJ when he last used cocaine, plaintiff answered that it was "years ago . . . maybe four." (Tr. 37). When asked whether he told one of his psychiatrists in January or February of 2008 that he had used cocaine, plaintiff answered that it "was just a documentation of it. It wasn't exactly usage." (Tr. 37-38). He testified that he had abused Xanax, possibly as recently as December 2009. (Tr. 38).

Plaintiff testified that he was placed in "special education" classes in high school because of his difficulty in getting along with teachers and keeping pace. (Tr. 38-39). He claimed that even with the orthotics he can only walk for a period of fifteen minutes without having to stop. When asked if a doctor had ever recommended that he go through any type of rehabilitation program for prescription medication abuse, plaintiff answered in the negative. (Tr. 39). Plaintiff testified that his depression causes him to be tired and without focus. He stated that a few times a week he does not leave his bedroom and that he suffers from panic attacks that make him sick. (Tr. 41).

Delores E. Gonzalez, a vocational expert, provided testimony regarding plaintiff's current employment opportunities. (Tr. 46-50). The ALJ asked whether any of plaintiff's previous jobs could be performed by a 36-year-old individual with at least 12 years of education and plaintiff's past work experience, who can lift and carry 20 pounds occasionally, 10 pounds frequently, stand or walk for six hours out of eight, sit for six hours, is able to understand, remember and carry out simple to moderately complex instructions and tasks, who should not work in a setting which includes

-4-

constant or regular contact with the general public, and should not perform work which includes more than infrequent handling of customer complaints. Ms. Gonzalez answered in the negative.

The ALJ inquired whether the hypothetical individual could perform the warehouse work that plaintiff described during the hearing and Ms. Gonzalez answered in the affirmative. Ms. Gonzalez also testified to other areas of light work that the hypothetical individual would be able to perform. Ms. Gonzalez opined that such an individual could work as a hand presser (of which there are 1,210 jobs within the state of Missouri) and an electrode cleaner (of which there are 9,740 jobs within the state of Missouri). However, Ms. Gonzalez testified that if the hypothetical individual required four days off from work a month due to panic attacks or depression, then employment would be precluded.

## C. Medical Evidence

Although Plaintiff claims an alleged onset date of July 1, 2007, the Court has reviewed all medical reports in the record starting from early 2004 for the purpose of gaining insight on the progression of plaintiff's alleged impairments.

On February 18, 2004, plaintiff saw Mary Ann Hollman, M.D. at SSM Corporate Health Services with complaints of right elbow pain and decreased strength in his right hand. Plaintiff alleged that he twisted his elbow two weeks prior when disposing of trash. Dr. Hollman diagnosed plaintiff with right lateral epicondylitis,[2] prescribed

---

[2] Lateral epicondylitis, otherwise known as "tennis elbow," is a condition which cases pain on the outside portion of the elbow. American Association for Hand Surgery, http://handsurgery.org/multimedia/files/public/latpicondylitis.pdf (last visited Jan. 4, 2013).

Naproxen,[3] provided a tennis elbow strap, and recommended icing and physical therapy. (Tr. 384-385).

On February 23, 2004, Melissa L. Shepard, a physical therapist at SSM Rehab, reported to Dr. Hollman that she had seen plaintiff for an initial consultation and that plaintiff described his pain as a 0 out of 10 at rest and a 4 out of 10 when performing certain movements. Ms. Shepard agreed with the diagnosis of lateral epicondylitis. (Tr. 486). The following day plaintiff went back to Dr. Hollman for a follow-up visit. Plaintiff reported that he felt no substantial improvement from his first visit and reported that his pain was a 4 out of 5. Dr. Hollman returned plaintiff to work without restrictions. (Tr. 378-379).

On March 3, 2004, Tina Veraldi, an occupational therapist at SSM Rehab, sent a progress note to Dr. Hollman. Ms. Veraldi wrote that plaintiff had improved range of motion and that he felt "comfort after treatment." (Tr. 498-499). On March 19, 2004, plaintiff appeared for his third visit with Dr. Hollman and decribed his pain to be a 6 out of 10 and also reported that he was laid off from work. Dr. Hollman noted that plaintiff cancelled an appointment with her two weeks prior and that due to the "delay in continuity of care," plaintiff might require a corticosteriod injection. (Tr. 372-373).

On March 26, 2004, plaintiff was administered the injection into the right lateral epicondyle by Katherine Burns, M.D. at Premier Care Orthopedics. Dr. Burns told plaintiff that he could work as long as he lifted no more than 10 pounds. Plaintiff was also encouraged to participate in physical therapy. (Tr. 444).

---

[3] Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

On April 8, 2004, Ms. Veraldi wrote a letter to Dr. Burns regarding plaintiff's "initial evaluation" at SSM Rehab. Plaintiff reported his pain to be a 7 or 8 out of 10 with light activity. (Tr. 450-451). On April 23, 2004, Ms. Veraldi wrote another letter to Dr. Burns noting some improvement with respect to supination and grip strength. (Tr. 446-447).

Plaintiff followed up with Dr. Burns on April 27, 2004. Plaintiff claimed that the injection did not help and that his pain was sometimes a 10 out of 10. After a physical exam, Dr. Burns noted that his right elbow was normal in appearance, mildly tender in no particular area, and had full range of motion. Dr. Burns wrote that despite plaintiff's reports of increased pain, his right lateral epicondylitis was clinically improved. Dr. Burns contacted Ms. Veraldi who agreed that plaintiff often rated his pain higher than his clinical appearance. Dr. Burns expressed the opinion that plaintiff had reached "maximal medical improvement," and that he did not have any permanent partial disability. She released plaintiff from her care. (Tr. 386).

On November 22, 2004, Bruce Schlafly, M.D. of Hand Surgery Associates saw plaintiff for the first and only time. Dr. Schlafly wrote a report to plaintiff's attorney which was based on a physical examination, review of medical history, and plaintiff's own account of his alleged injuries. Dr. Schlafly agreed with the diagnosis of lateral epicondylitis and noted that the condition generally improves with treatment of cortisone injections, physical therapy, and oral medication, but that it could return after treatment is discontinued. Dr. Schlafly concluded that plaintiff should avoid lifting more than 10 pounds with his right hand and upper extremity and should consider another injection or surgery. (Tr. 392-394).

On March 2, 2005, plaintiff saw Henry G. Ollinger, M.D. who ordered an MRI because the physical exam only revealed tenderness of the right elbow. (Tr. 398-400). On June 3, 2005, Dr. Ollinger reported that the MRI reflected elbow lateral epicondylitis with a minor amount of focal intratendinous signal within the distal biceps. A subsequent physical exam found no tenderness. Dr. Ollinger administered a Depo-Medrol injection into the right elbow and encouraged use of the strap, home exercise, and ice. (Tr. 401). On June 24, 2005, Dr. Ollinger noted some improvement with the injection, a lack of tenderness, and a mildly positive stress test. On July 19, 2005, Dr. Ollinger wrote that plaintiff had improvement with decreased pain and increased strength and that plaintiff could continue regular work activities. (Tr. 402). On August 17, 2005, Dr. Ollinger recommended surgery due the continuation of symptoms for over a year. (Tr. 403). Surgery was performed on September 2, 2005. (Tr. 404).

On September 15, 2005, Dr. Ollinger wrote that "despite [plaintiff's] comment[s] about discomfort he demonstrated [] full extension and flexion of the elbow." (Tr. 404). On September 29, 2005, Dr. Ollinger again wrote that plaintiff's motion was full despite complaints of pain. (Tr. 405). On October 31, 2005, Dr. Ollinger noted that therapy progress reports showed increased grip and strength measurement and improved range of motion despite plaintiff's failure to perform any strengthening exercises. (Tr. 406). On November 21, 2005, Dr. Ollinger found no tenderness, full range of motion, and good power. He also noted that plaintiff's therapy assessment reflected improvement in strength and fewer pain complaints. (Tr. 407). On March 28, 2006, Dr. Ollinger found no swelling or tenderness. He determined that plaintiff had reached "maximum medical improvement," and discharged plaintiff from his care with no work restrictions. (Tr. 428). Dr. Ollinger wrote a letter stating that, in his opinion,

plaintiff sustained only a 2% permanent disability at the level of his right elbow. (Tr. 429).

Between October 9, 2006 and October 25, 2007, plaintiff saw David S. Rosenberg, M.D. at North Country Medicine and Rheumatology. The progress notes in the record are brief and mostly contain a list of plaintiff's prescriptions and dosage. (Tr. 509-515).

On January 11, 2008, plaintiff underwent a "general medicine evaluation" by non-treating physician, Elbert H. Cason, M.D. who issued a report based on a physical examination, a review of "a few doctor's notes," and plaintiff's account of his alleged injuries. Dr. Cason found decreased motion of the cervical spine and no evidence of any pathology of the hands, arms, back, knees, foot or hips. (Tr. 517-519). On the same day plaintiff underwent a psychiatric evaluation with L. Lynn Mades, Ph.D. who gave plaintiff a Global Assessment of Functioning (GAF)[4] of 65-70[5] and wrote that plaintiff's prognosis was fair with appropriate intervention and management of psychoactive medications. (Tr. 525-530).

On January 29, 2008, plaintiff underwent a second psychiatric review by Kyle Devore, Ph.D. The report reflects that plaintiff's impairments, which are described as

---

[4] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[5] A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

personality and mood disorders, were nonsevere. Dr. Devore indicated in a checklist format that plaintiff had mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 525-542). The RFC Assessment in the record is incomplete and lists plaintiff's sole limitation as an inability to reach in all directions. (Tr. 543-548). On March 20, 2008, Linda S. Trevathan, a family nurse practitioner at St. Louis County Health, wrote a one-sentence letter stating that "Mr. Saal is unable to work at this time due to his mental and physical health." (Tr. 549).

On February 9, 2009, plaintiff saw W. Morel, D.O. at Jewish Family and Children's Service who discontinued plaintiff's Amitriptyline[6] and Xanax[7] prescriptions and added Klonopin.[8] (Tr. 567). On March 2, 2009, Dr. Morel wrote in a progress note that plaintiff had made multiple telephone calls "demanding" Xanax in a "hostile tone." (Tr. 566). On March 9, 2009, plaintiff "got enraged and began cursing" in Dr. Morel's office when Xanax was not prescribed to him. Notes state that plaintiff was told that he was "becoming addicted and over medicated." (Tr. 565). On April 6, 2009, plaintiff went to Dr. Morel's office without an appointment. After inquiring about Xanax he became very upset, threatened to punch a wall, and was asked to leave. (Tr. 564). On April 13, 2009, plaintiff returned to Dr. Morel for a scheduled appointment. He

---

[6] Amitriptyline is a tricyclic antidepressant. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (last visited on Jan. 7, 2013).

[7] Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

[8] Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders. See Phys. Desk Ref. 2782 (60th ed. 2006).

explained that he was feeling anxious and depressed due to a friend's death. Plaintiff was instructed to continue the Klonopin for his anxiety. (Tr. 563).

On April 21, 2009, Wayne A. Stillings, M.D. performed an independent medical examination. The report produced was based on three psychological tests, school and medical records, and plaintiff's own account of his impairments and family history. Dr. Stillings gave plaintiff a GAF of 45.[9] Dr. Stillings wrote that his physical and mental conditions combined are "an obstacle to employment/re-employment, creating a total disability greater than the simple sum rendering him permanently and totally disabled from gainful employment[.]" (Tr. 550-560).

On May 11, 2009, plaintiff returned to Dr. Morel. Plaintiff expressed that he was feeling aggravated and stressed, was not sleeping well, and was financially distressed in that he could not even afford to purchase a pack of cigarettes. (Tr. 562). Dr. Morel increased plaintiff's Wellbutrin[10] dosage.

An undated and unsigned residual functional capacity assessment is included in the record. A date stamp shows that it was received by the Office of Disability Adjudication and Review on June 12, 2009. The writer listed plaintiff's diagnoses as anxiety disorder, antisocial personality traits, irritable bowel syndrome (IBS), and foot pain, and assigned plaintiff a GAF score of 65. The writer checked off that plaintiff had no restrictions in daily living, marked difficulties in maintaining social functioning,

---

[9] A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[10] Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

seldom deficiencies of concentration, persistence or pace, and repeated episodes of decompensation. (Tr. 568-571).

Plaintiff returned to Dr. Morel on July 6, 2009, who wrote "patient doing better with less anxiety during the day." On August 3, 2009, Dr. Morel wrote that patient reported decreased energy, but that anxiety had lessened with no depressive symptoms. On September 14, October 26, and November 23, 2009 plaintiff returned for follow-up visits. Dr. Morel's brief progress notes generally reflect plaintiff's frustration with his disability claim. However, at each visit, Dr. Morel described plaintiff's anxiety disorder as "stable." (Tr. 579-584). On December 21, 2009, Dr. Morel wrote that plaintiff had stopped abusing Xanax. (Tr. 578).

On January 14, 2010, plaintiff saw Robert Baird, M.D., who wrote that he had been treating plaintiff for the past two years and that his psychiatric problems seemed worse. Dr. Baird wrote that plaintiff appeared to be anxious and depressed, but not in acute distress, and that he was disabled, unable to work and should be given food stamps. (Tr. 601-602). On January 20, 2010, plaintiff returned to Dr. Baird for refills. Plaintiff complained of painful and sore feet and Dr. Baird noted that plaintiff also suffered from hyperhidrosis.[11] (Tr. 600).

On March 1, 2010, plaintiff saw Rodney E. Yarnal, M.D., who wrote that plaintiff smelled of alcohol, but that plaintiff denied drinking. Dr. Yarnal suggested decreasing plaintiff's clonazepam and bupropion dosages, but that plaintiff grew "angered." (Tr. 577). A similar visit occurred on June 14, 2010, where plaintiff was resistant to any changes in medication or treatment, although he did agree to a trial of Amitripyline.

---

[11] Hyperhidrosis is a common disorder defined by excessive sweating. http://www.webmd.com/skin-problems-and-treatments/hyperhidrosis2 (last visited Jan. 8, 2013).

From March 2, 2010 to November 6, 2010, plaintiff saw Denise McBain, a licensed clinical social worker with a masters in social work. Ms. McBain assigned plaintiff GAF scores ranging from 56 to 65 and wrote that plaintiff continued to make "moderate improvement." (Tr. 607-613).

Dr. Yarnal completed a residual functional assessment for plaintiff, dated April 26, 2010. Dr. Yarnal did not fill out a portion of the form and wrote that what he did complete was based on two visits with the plaintiff. Dr. Yarnal checked off that the only limitation plaintiff would have in terms of mental abilities and aptitude needed to do unskilled work would relate to accepting instructions and responding appropriately to criticism from supervisors. (Tr. 572-575). On August 9, 2010, plaintiff saw Dr. Yarnal for a follow-up appointment. Dr. Yarnal wrote that he questioned whether plaintiff had an alcohol abuse problem. Dr. Yarnal discussed several treatment options for his ailments and noted that plaintiff declined all suggestions. Dr. Yarnal encouraged plaintiff to "find an activity outside the home . . . to give structure to his schedule, and perhaps to bring some satisfaction." Plaintiff was very reluctant to the idea. (Tr. 619). On September 28, 2010, plaintiff saw Dr. Baird because of a cut on his hand and expressed his dissatisfaction with Dr. Yarnal. (Tr. 635-636).

The record contains a short medical report dated October 4, 2010 showing that plaintiff saw Zachary J. Newland, DPM for pain in his foot and ankle. Plaintiff was prescribed Flexeril.[12] (Tr. 634). The record also contains an unsigned and mostly illegible progress note, dated October 18, 2010, which might have been written by Dr.

---

[12] Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

Morel. Plaintiff reported feeling depressed and unmotivated. Plaintiff was instructed to call 911 or go to an emergency room if he felt suicidal or homicidal.

On November 9, 2010, plaintiff underwent a medical evaluation by non-treating physician Robert P. Poetz, D.O. who issued a report to plaintiff's lawyer. The report was based on a physical examination, a review of medical records, and plaintiff's own account of his condition. Dr. Poetz found a 35% permanent partial disability to plaintiff's upper right extremity, a 20% permanent partial disability to plaintiff's body as a whole as measured at the cervical spine, and 20% permanent partial disability to the body as a whole as measured at the lumbar spine. (Tr. 622-628).

On November 22, 2010, plaintiff attended a follow-up appointment with Dr. Yarnal. Plaintiff was given a GAF of 55. Dr. Yarnal again noted plaintiff's resistance to any adjustment in his medication. Dr. Yarnal also wrote that plaintiff complained of IBS symptoms but that his medical write ups were negative. (Tr. 616).

On December 15, 2010, plaintiff underwent a "vocational rehabilitation evaluation" by a vocational rehabilitation counselor, Timothy G. Lalk, who issued a report to plaintiff's lawyer. The report was based on an interview with plaintiff, a review of medical records, and plaintiff's own account of his impairments. Mr. Lalk opined that plaintiff "is not able to secure and maintain employment in the open labor market and is not able to compete for any position." Mr. Lalk further wrote that he does "not believe that [plaintiff's] psychiatric condition would allow him to work in any position where he could provide service at a sedentary level in order to avoid more physically demanding work." (Tr. 337-360).

### III. The ALJ's Decision

In the decision issued on February 24, 2011, the ALJ made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2012.

2.  Plaintiff has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date.

3.  Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine, obesity, degenerative changes of the left hip, anxiety disorder, personality disorder NOS, and status-post epicondylitis.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the retained ability to understand, remember, and carry out simple to moderately complex tasks; but, no working in a setting which includes constant/regular contact with the general public and which includes more than infrequent handling of customer complaints.

6.  Plaintiff is capable of performing past relevant work as a warehouse worker. This work does not require the performance of work-related activities precluded by the claimaint's RFC.

7.  Plaintiff has not been under a disability, as defined in the Social Security Act, from July 1, 2007, through the date of this decision.

(Tr. 12-22).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240

F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite his limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect

-16-

his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The

burden at step four remains with the claimant to prove his RFC and establish that he cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff contends that (1) the ALJ failed to accord adequate weight to the opinion of plaintiff's treating physician; (2) the ALJ failed to recontact the consultative physician for more information; and (3) the new evidence from the Missouri Division of Workers' Compensation and from Dr. Tsvirko warrants changing the ALJ's decision or remanding for a new hearing. (Doc. #12).

## A. Opinion of Plaintiff's Treating Physician Dr. Morel

"In deciding whether a claimant is disabled, the ALJ considers medical opinion along with "the rest of the relevant evidence" in the record.  20 C.F.R. § 404.1527(b). The opinion of a treating source should be given controlling weight where it is well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the record as a whole.  20 C.F.R. § 404.1527(c)(2). If an ALJ discredits a portion of a

treating physician's opinion, the ALJ must give good reasons for doing so. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

The ALJ did not give any indication that he discredited the opinions of plaintiff's treating physician, Dr. Morel. The ALJ included in his decision the progress notes from plaintiff's appointments with Dr. Morel and did not dispute the content of those records. On March 2, March 9, and April 6, 2009, Dr. Morel expressed concern with plaintiff's resistance in discontinuing his Xanax prescription. Notes state that plaintiff was told he was "becoming addicted and over medicated." However, on April 13, 2009 and May 11, 2009, Dr. Morel's notes did not mention a concern for continued addictive behaviors. As a substitution to Xanax, plaintiff took Wellbutrin and Klonopin and there is was no indication in Dr. Morel's notes that plaintiff had any difficulties with this adjustment. On July 6, 2009, plaintiff reported less anxiety during the day. On August 3, 2009, plaintiff told Dr. Morel that he continued to have less anxiety and no depressive symptoms. On September 14, October 26, and November 23, 2009, Dr. Morel described plaintiff's anxiety disorder as "stable." On December 21, 2009, Dr. Morel confirmed that plaintiff had stopped abusing Xanax. None of these records are disputed by the ALJ. Instead, the ALJ made an appropriate determination that these notes do not reflect an inability to function or to maintain employment and that the introduction of Klonopin and Wellbutrin along with the elimination of Xanax was to the plaintiff's benefit as he seemed to respond favorably.

Also in the record is an unsigned and undated residual capacity assessment. The ALJ wrote that it could have been completed by Dr. Morel. If this form was in fact authored by Dr. Morel, this is the only instance where the ALJ discredited his opinion. "An ALJ is entitled to give less weight to a medical opinion . . . when the physician's

notes are inconsistent with the RFC assessment. Kirby v. Astrue, 500 F.3d 705 (8th Cir. 2007); Hacker v. Barnhart, F.3d 934, 937 (8th Cir. 2006). The assessment includes various indications in a checkmark format that plaintiff lacked certain mental abilities and aptitude needed to do unskilled work. These conclusions are contrary to Dr. Morel's treatment notes, which reflect a consistent and progressive improvement in plaintiff's anxiety disorder. Additionally, Dr. Morel never mentioned any limitations or concerns about plaintiff's ability to sustain employment. The assessment itself is also contradictory in that the writer gave plaintiff a GAF of 65, which indicates only mild symptoms. This GAF score is in line with other opinions in the record.[13] Furthermore, forms in a checklist format may be given less weight when making a disability determination. See Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The checklist format, generality, and incompleteness of the assessments limit evidentiary value."). Accordingly, the Court finds no error in the ALJ's treatment of Dr. Morel's medical opinions.

## B. Duty to Recontact the Consulting Physician

Plaintiff argues that the Social Security regulations imposed a duty upon the ALJ to recontact "the consulting physician for more information." Plaintiff's brief does not specify, and it is not clear to the Court, which consulting physician plaintiff is referring to since there is more than one consulting physician opinion included in the record.

Additionally, plaintiff's brief does not identify a reason for the ALJ to recontact any of the consulting physicians of record or what specific additional information the

_____

[13] On January 11, 2008, Dr. Mades assigned plaintiff a GAF of 65-70. Ms. McBain, a licensed social worker who saw plaintiff 14 times from March 2, 2010 to November 6, 2010, assigned plaintiff a GAF ranging from 56 to 65. As an outlier, only one consulting physician assigned plaintiff a lower GAF of 43.

ALJ should have acquired.  Although, the ALJ does have a duty to fully develop the record, there needs to be some indication that some part of the record was incomplete, ambiguous or inherently contradictory in order to recontact a medical source for clarification. See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006); 20 C.F.R. 404.1512(e)(1) (ALJ must contact a medical source for clarification if the evidence received contains a conflict of ambiguity that must be resolved, the report does not does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques). After a review of the medical record, the Court cannot find any reason for requiring the ALJ to recontact any of the consulting physicians.

### C. New Evidence from Missouri Division of Workers' Compensation

Plaintiff argues that the evidence he provided to the Appeals Council regarding a finding of plaintiff's permanent and total disability by the Missouri Division of Workers' Compensation warrants a reversal of the ALJ's decision or a remand for a new hearing.

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. 20 C.F.R. § 404.970(b). If the Appeals Council finds that the ALJ's conclusions are contrary to the weight of evidence, including the new evidence, it will review the case. Id. In the instant case, the Appeals Council considered the new evidence, adopted it

as part of the administrative record, then denied review, finding that the new evidence did not provide a basis for changing the ALJ's decision. (Tr. 1-4, 363-370).

This Court does not review the Appeals Council's denial but determines whether substantial evidence on the record as a whole, including the new evidence, supports the ALJ's determination. See 20 C.F.R. § 404.970(b); Long, 108 F.3d at 187. "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes, 275 F.3d at 724. This standard is not eliminated simply because a state agency made a different determination regarding plaintiff's disability. See 20 C.F.R. 404.1504 ("A decision by any . . . other governmental agency about whether you are disabled . . . is based on its rules and is not our decision[.] We must make a disability or blindness determination based on social security law.").

The decision of the state agency consists of a brief and partial summary of plaintiff's medical history with a conclusory statement that plaintiff is permanently and totally disabled. This evidence makes little to no impact on the record. The ALJ's decision denying benefits continues to supported by substantial evidence and the inclusion of this new evidence does not support a remand or a reversal.

## D. New Evidence

Plaintiff has submitted to the Court documents reflecting treatment he received from a Dr. Tsvirko between January 24, 2011 and November 14, 2011 and a residual capacity assessment, dated November 28, 2011. The January 24, 2011 treatment note was authored prior to the date that the ALJ made his hearing decision. The remaining treatment notes and assessment were authored prior to the date that the Appeals

Council denied plaintiff's request for review. Plaintiff asserts that this documentation constitutes new evidence that warrants reversal or remand.

"42 U.S.C. § 405(g) generally precludes consideration on review of evidence outside the record before the Commissioner during the administrative proceedings." Jones v. Callahan, 122 F.3d 1148 (8th Cir. 1997). However, a court may remand a case to the ALJ when "new and material evidence is adduced that was for *good cause* not presented during the administrative proceedings." Krogmeier v. Barnhart, 294 F.3d 1019, 1024-25 (8th Cir. 2002) (emphasis added) (citing Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000)). Plaintiff does not provide any reason, let alone good cause, for why these records were not presented to either the ALJ or the Appeals Council. "As the claimant, [plaintiff] bears the burden of proving his disabilities, 20 C.F.R. §§ 404.1512(a), 416.912(a), and he thus had the responsibility for presenting the strongest case possible." Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). For whatever reason, plaintiff chose to refrain from submitting these records during the administrative proceedings, which does not give good cause for remand. See id.

Further, there is "[a]n implicit requirement [] that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition." Jones, 122 F.3d at 1154. As previously stated, the ALJ properly determined that plaintiff's medical conditions were non-disabling. If plaintiff is attempting to use Dr. Tsvirko's notes as additional evidence showing a deterioration of his condition after the ALJ's decision, this would not be a material basis for remand, but could be grounds for a new application for benefits. See id.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #12] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of January, 2013.